1   WO

2

3

4

5

6           **IN THE UNITED STATES DISTRICT COURT**

7              **FOR THE DISTRICT OF ARIZONA**

8

9   Ronald Sweezy, Jr.,              No. CV-14-02057-TUC-DTF

10            Plaintiff,          **ORDER**

11   v.

12   Carolyn W. Colvin,

13            Defendant.

14        Plaintiff Ronald Sweezy, Jr., filed this action pursuant to 42 U.S.C. § 405(g)

15 seeking judicial review of a final decision by the Commissioner of Social Security

16 (Commissioner). (Doc. 1.) Before the Court are Sweezy's Opening Brief, Defendant's

17 Brief, and Sweezy's Reply. (Docs. 24, 28, 32.) The parties have consented to Magistrate

18 Judge jurisdiction. (Doc. 17.) Based on the pleadings and the administrative record

19 submitted to the Court, this matter is remanded for further proceedings.

20                   **PROCEDURAL HISTORY**

21        Sweezy filed applications for Supplemental Security Income (SSI) and Disability

22 Insurance Benefits (DIB) on June 23, 2010. (Administrative Record (AR) 114, 121.) He

23 alleged disability from July 1, 2009. (AR 114, 121.) Sweezy's applications for SSI and

24 DIB were denied upon initial review (AR 58, 59) and on reconsideration (AR 60, 61). A

25 hearing was held on May 9, 2012 (AR 46-57), after which ALJ Norman R. Buls found, at

26 Step Five, that Sweezy was not disabled. (AR 31-40.) The Appeals Council denied

27 Sweezy's request to review the ALJ's decision. (AR 1.)

28

1      **FACTUAL HISTORY**

2          Sweezy was born on December 8, 1972, making him 36 years of age at the onset

3      date of his alleged disability. (AR 114.) From 1997 to 2008, he worked as a wild land

4      firefighter. (AR 148.)

5          The ALJ found Sweezy had two severe impairments, L5-S1 disc bulge and

6      paracentral disc protrusion. (AR 33.) The ALJ concluded Sweezy had the Residual

7      Functional Capacity (RFC) to perform the full range of light work, with occasional

8      climbing and stooping, frequent kneeling, crouching and crawling. (AR 35.) Sweezy was

9      found unable to perform any past relevant work. (AR 39.) At Step Five, the ALJ

10     concluded, based on the Medical-Vocational Guidelines, that Sweezy could perform

11     other work available in the national economy. (AR 39-40.)

12                 **STANDARD OF REVIEW**

13         The Commissioner employs a five-step sequential process to evaluate SSI and

14     DIB claims. 20 C.F.R. §§ 404.1520; 416.920; *see also Heckler v. Campbell*, 461 U.S.

15     458, 460-462 (1983). To establish disability the claimant bears the burden of showing he

16     (1) is not working; (2) has a severe physical or mental impairment; (3) the impairment

17     meets or equals the requirements of a listed impairment; and (4) claimant's RFC

18     precludes him from performing his past work. 20 C.F.R. §§ 404.1520(a)(4),

19     416.920(a)(4). At Step Five, the burden shifts to the Commissioner to show that the

20     claimant has the RFC to perform other work that exists in substantial numbers in the

21     national economy. *Hoopai v. Astrue*, 499 F.3d 1071, 1074 (9th Cir. 2007). If the

22     Commissioner conclusively finds the claimant "disabled" or "not disabled" at any point

23     in the five-step process, she does not proceed to the next step. 20 C.F.R.

24     §§ 404.1520(a)(4), 416.920(a)(4).

25         "The ALJ is responsible for determining credibility, resolving conflicts in medical

26     testimony, and for resolving ambiguities." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th

27     Cir. 1995) (citing *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989)). The findings

28     of the Commissioner are meant to be conclusive if supported by substantial evidence. 42

1   U.S.C. § 405(g). Substantial evidence is "more than a mere scintilla but less than a
2   preponderance." *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (quoting *Matney v.*
3   *Sullivan*, 981 F.2d 1016, 1018 (9th Cir. 1992)). The court may overturn the decision to
4   deny benefits only "when the ALJ's findings are based on legal error or are not supported
5   by substantial evidence in the record as a whole." *Aukland v. Massanari*, 257 F.3d 1033,
6   1035 (9th Cir. 2001). This is so because the ALJ "and not the reviewing court must
7   resolve conflicts in the evidence, and if the evidence can support either outcome, the
8   court may not substitute its judgment for that of the ALJ." *Matney*, 981 F.2d at 1019
9   (quoting *Richardson v. Perales*, 402 U.S. 389, 400 (1971)); *Batson v. Comm'r of Soc.*
10  *Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004). The Commissioner's decision,
11  however, "cannot be affirmed simply by isolating a specific quantum of supporting
12  evidence." *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998) (citing *Hammock v.*
13  *Bowen*, 879 F.2d 498, 501 (9th Cir. 1989)). Reviewing courts must consider the evidence
14  that supports as well as detracts from the Commissioner's conclusion. *Day v.*
15  *Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975).

16  **DISCUSSION**

17      Sweezy argues the ALJ committed three errors: (1) the ALJ improperly rejected
18  treating physician Kimberly Carlson's opinion and relied upon the report of an examining
19  physician; (2) the ALJ erroneously evaluated Sweezy's credibility; and (3) the ALJ
20  improperly relied upon the Grids at Step Five.

21      **Medical Opinions**

22      Sweezy argues the ALJ erred in rejecting the opinion of treating physician
23  Kimberly Carlson, who concluded Sweezy could do less than sedentary work, in favor of
24  the opinion of examining physician Jeri Hassman, who concluded Sweezy could do light
25  work. Generally, a treating physician's opinion is afforded more weight than the opinion
26  of an examining physician, and an examining physician's opinion is afforded more
27  weight than a non-examining or reviewing physician's opinion. *Holohan v. Massanari*,
28  246 F.3d 1195, 1202 (9th Cir. 2001). When there are contradictory medical opinions such

1    as there are in this case, to reject a treating physician's opinion, the ALJ must provide

2    "specific and legitimate reasons that are supported by substantial evidence." *Bayliss v.*

3    *Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005).

4        As an initial matter, Sweezy argues Dr. Hassman's opinion is not substantial

5    evidence; therefore, Dr. Carlson's opinion is uncontested and the ALJ must provide clear

6    and convincing reasons to reject it. *See Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir.

7    1998). To support this argument, Sweezy relies upon a Ninth Circuit case holding that

8    "[w]hen an examining physician relies on the same clinical findings as a treating

9    physician, but differs only in his or her conclusions, the conclusions of the examining

10   physician are not 'substantial evidence.'" *Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir.

11   2007). Dr. Hassman examined Sweezy two years before Dr. Carlson began seeing

12   Sweezy, reviewed some 2008 and early 2009 medical records (including a January 2009

13   MRI), and conducted his own exam (AR 245-48). Dr. Carlson conducted her initial exam

14   of Sweezy on August 4, 2011, and would have had access to Sweezy's prior medical

15   records from Carondelet, where Sweezy began care in March 2010 (AR 322). There is no

16   basis to find that Dr. Hassman relied on the same clinical findings as Dr. Carlson. Thus,

17   the ALJ was required to provide specific, legitimate reasons for rejecting Dr. Carlson's

18   opinion.

19       In August 2011, Dr. Carlson opined that Sweezy could lift 20 pounds

20   occasionally, could stand/walk less than 2 hours of a work day, and sit less than 1 hour;

21   needed to alternate sitting and standing every 45 minutes to an hour; could never climb,

22   balance, stoop, kneel, crouch; could occasionally crawl; and could not drive due to

23   medication. (AR 416-18.) Dr. Carlson also opined that because Sweezy had moderately

24   severe pain, he would have constant deficiencies in concentration, persistence or pace.

25   (AR 419-20.) The ALJ gave her opinion minimal weight:

26       The residual functional capacity specified is too restrictive in light of the
         other evidence of record. The only supporting findings noted in the opinion
27       are "difficulty dressing himself, [and inability] to drive due to pain
         medication." While such findings may be useful in a determination, they
28

- 4 -

1
2
3
4

> are not significant enough to find the claimant incapable of performing work activities. In addition, the rest of the evidence does not necessarily support the findings. In fact, the claimant admitted that he is able to perform personal care. He did mention not driving due to concerns about medications, but he is not precluded from driving.

5

(AR 37.)

6
7
8
9
10
11
12
13
14
15
16
17

    The ALJ determined that the reasoning provided by Dr. Carlson – that Sweezy had difficulty dressing himself and could not drive – was not supported by the record. The Court disagrees. Although Sweezy reported that he could groom himself (AR 221, 402), in his function report, Sweezy stated that he needed to lie down to get dressed. (AR 139.) Dr. Carlson did not state that Sweezy could not manage to dress himself, she merely found it was a challenge. There is nothing in the record that undermines Dr. Carlson's finding that Sweezy "had trouble" dressing himself. Similarly, there is no foundation for the ALJ's distinction that Sweezy is not "precluded" from driving but does not drive due to his medication. It is illegal in Arizona to drive under the influence of any drug if the person is impaired "to the slightest degree." Ariz. Rev. Stat. § 28-1381(A)(1). The record is consistent that Sweezy does not drive due to the effect of his medications; thus, there is no evidence to support the ALJ's finding that Sweezy could drive.

18
19
20
21
22
23
24
25
26
27
28

    Although the rationales provided by Dr. Carlson are supported by the record, the ALJ pointed out that they do not provide a basis for Dr. Carlson's opinion that Sweezy cannot work full-time. This is a legitimate reason for the ALJ to discount Dr. Carlson's opinion. The form completed by Dr. Carlson asked the question, "describe the findings that support the above limitations," and Dr. Carlson stated only that Sweezy had trouble dressing himself and could not drive. (AR 418.) These rationales do not demonstrate why Sweezy was limited in his ability to carry a particular weight, couldn't stand/walk or sit for any extended period, and had deficiencies in concentration/persistence/pace. It is permissible for an ALJ to discount a treating physician's opinion if the doctor does not provide a basis for her conclusions. *See Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (finding it legitimate for ALJ to reject a check-off report without supporting explanations that the form requested). Sweezy contends that Dr. Carlson's opinion was

1    based on significant experience with her patient and numerous records, thus, it should not

2    have been discounted for lack of explanation. (Doc. 24 at 23, citing *Garrison v. Colvin*,

3    759 F.3d 995, 1013 (9th Cir. 2014)[1].) Here, Dr. Carlson had met Sweezy for the first time

4    a week prior to completing the form. (AR 614, 618.) Thus, Dr. Carlson was not relying

5    upon extensive experience with Sweezy or numerous records from their patient-doctor

6    relationship. Dr. Carlson arguably had access to Carondelet records back to 2010, but

7    there is no documentation that she reviewed those records before issuing her opinion.

8    Additionally, the records from Sweezy's prior Carondelet doctor, Dr. Celis, document

9    chronic pain but not any abnormal musculoskeletal findings.  (AR 316-24, 349-54, 622-

10   37.)

11         The ALJ also discounted Dr. Carlson's opinion as inconsistent with the other

12   evidence of record. In summarizing the medical evidence, the ALJ relied upon the

13   examination and opinion of Dr. Hassman, who concluded Sweezy could do the exertional

14   requirements of light work. (AR 250-51.) The ALJ cited an April 2012 X-ray, noting disc

15   degeneration at L5-S1 but no fracture or spondylolithesis. (AR 579, 586.) The ALJ also

16   cited two consulting psychologists: Dr. Rau concluded Sweezy could remain focused but

17   would struggle with efficiency over the course of a day; and Dr. Wetmore concluded

18   Sweezy would have little difficulty with sustained concentration. (AR 223, 404.) This is

19   substantial evidence to support the ALJ's determination that Dr. Carlson's opinion was

20   more restrictive than warranted by the record.

21         The Court finds the ALJ provided specific and legitimate reasons to discount the

22   opinion of Dr. Carlson. However, because this case is being remanded on another ground,

23   the Court notes an issue for the ALJ to address upon remand. The ALJ gave great weight

24   to the opinion of Dr. Hassman but did not acknowledge or adopt his opinion that Sweezy

25   would need a 5-10 minute break every hour from either standing or sitting. (AR 250.) If

26   _____

27         [1]      In citing *Garrison*, Plaintiff quoted language providing that the doctor's
     opinion was "based on significant experience." However, in that case, the court relied not
28   upon the doctor's experience generally but on his experience *with* the patient. 759 F.3d at
     1013. Therefore, the Court evaluates this argument in that context.

1    that limitation is adopted, the ALJ would need testimony from a vocational expert on

2    whether there is work available in the national economy for a person with that RFC.

3            **Credibility**

4            Sweezy challenges the ALJ's finding on his credibility regarding his symptoms.

5    The ALJ found that Sweezy's testimony was not fully credible. The ALJ noted five

6    factors in making his credibility finding: Sweezy testified to unremitting pain but there

7    are large gaps in the record when he sought no treatment and the treatment he received

8    was conservative; common effects of chronic pain are weight loss and muscle wasting,

9    neither of which Sweezy exhibits; Sweezy testified to activities of daily living that show

10   a significant degree of functioning; Sweezy testified he could perform actions consistent

11   with light work, and he has sought employment; and Sweezy's allegations exceed that

12   expected by the medical findings. (AR 38-39.)

13           In general, "questions of credibility and resolution of conflicts in the testimony are

14   functions solely" for the ALJ. *Parra v. Astrue*, 481 F.3d 742, 750 (9th Cir. 2007)

15   (quoting *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982)). However, "[w]hile an

16   ALJ may certainly find testimony not credible and disregard it . . . [the court] cannot

17   affirm such a determination unless it is supported by specific findings and reasoning."

18   *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 884-85 (9th Cir. 2006); *Bunnell v. Sullivan*,

19   947 F.2d 341, 345-346 (9th Cir. 1995) (requiring specificity to ensure a reviewing court

20   the ALJ did not arbitrarily reject a claimant's subjective testimony); SSR 96-7p. "To

21   determine whether a claimant's testimony regarding subjective pain or symptoms is

22   credible, an ALJ must engage in a two-step analysis." *Lingenfelter v. Astrue*, 504 F.3d

23   1028, 1035-36 (9th Cir. 2007).

24           "First, the ALJ must determine whether the claimant has presented objective

25   medical evidence of an underlying impairment 'which could reasonably be expected to

26   produce the pain or other symptoms alleged.'" *Id.* at 1036 (quoting *Bunnell*, 947 F.2d at

27   344). ALJ Buls found Sweezy had satisfied part one of the test by proving an impairment

28   that could produce the symptoms alleged. (AR 35.) Second, if "there is no affirmative

evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (quoting *Smolen v. Chater*, 80 F.3d 1273, 1281, 1283-84 (9th Cir. 1996)). The ALJ did not make a finding, and there is no record evidence of, malingering. Therefore, to support his discounting of Sweezy's assertions regarding the severity of his symptoms, the ALJ had to provide clear and convincing, specific reasons. *See Garrison v. Colvin*, No. 12-15103, 2014 WL 3397218, at *16 (9th Cir. July 14, 2014); *Vasquez v. Astrue,* 547 F.3d 1101, 1105 (9th Cir. 2008) (quoting *Lingenfelter*, 504 F.3d at 1036).

First, the ALJ stated that Sweezy testified to unremitting pain but there are large gaps in the record when he sought no treatment and he received only conservative treatment. The ALJ provided no examples or record citations to support his finding that there were large time gaps in treatment. By the Court's review, from the date of onset through the remainder of the administrative record, Sweezy had no gaps in medical appointments that were three months or longer. During that period of 34 months, from July 2009 to April 2012, Sweezy had 38 encounters with medical professionals related to his back pain. (AR 271, 290, 292, 317-18, 320-21, 323, 337, 338, 339, 340, 341, 342-43, 350-51, 354, 394-95, 426, 462, 463, 464, 465, 466, 467,468, 470-72, 474-75, 579-80, 590-91, 603-05, 607-09, 610-12, 614-16, 618-20, 622-23, 624-25, 626-28, 629-31, 632-34, 635-37.) Defendant looked specifically at the time after Sweezy had the spinal cord stimulator installed, arguing there were few appointment records after that time. In the five months reflected in the record after the implantation, Sweezy had two regular appointments with his primary care physician, plus two medical visits due to a fight that injured his knee and exacerbated his back pain. (AR 579, 590, 594, 603.) Additionally, both records from his primary care doctor and his testimony reflect that Sweezy was having the stimulator adjusted at other appointments not documented in the administrative record. (AR 52 (testifying that doctors tell him to continue coming back for adjustments in hope that it will help), AR 603 (noting stimulator reprogrammed on

1  January 12, 2012), AR 589 (noting stimulator adjusted week prior to April 30, 2012).)

2  There is not substantial evidence in the record to support the ALJ's finding that there

3  were "large" gaps in treatment, before or after the spinal cord stimulator was implanted.

4      With respect to treatment, the ALJ states that it was conservative, consisting

5  primarily of pharmacological and palliative remedies. This finding also is not supported

6  by substantial evidence. Sweezy had surgery on his L5-S1disc in August 2008. (AR 212.)

7  His surgeon subsequently, in February 2009 and April 2010, stated that Sweezy was not a

8  candidate for further surgery. (AR 271, 451.) During 2010 and 2011, Dr. Chase

9  performed 10 spinal injections on Sweezy. (AR 337-41, 462-66.) Thereafter, Sweezy had

10  a spinal cord stimulator surgically implanted. (AR 426.) This amounts to significantly

11  more treatment than solely conservative pharmacological and palliative remedies.

12      Second, the ALJ stated that Sweezy did not exhibit two common effects of chronic

13  pain, weight loss and muscle wasting. These findings by the ALJ are not based on any

14  medical evidence of record, thus, there is not substantial evidence to support them.[2] *See*

15  *Lapeirre-Gutt v. Astrue,* 382 Fed. App'x 662, 665 (9th Cir. 2010) (finding that lack of

16  muscle atrophy was an assumption by the ALJ without support in the medical record);

17  *see also Winans v. Colvin*, No. CV-13-613-BPV, 2014 WL 4259471, at *6 (D. Ariz. Aug.

18  29, 2014) (finding error in ALJ making improper lay medical judgment regarding

19  absence of muscle atrophy and weight loss).

20      Third, the ALJ concluded that Sweezy's testimony regarding his activities of daily

21  living – ability to cook, clean, do laundry, wash dishes, shop, care for personal needs,

22  rake the yard, drive, watch television, listen to music, draw and play video games –

23  showed a significant level of functioning. In support of this finding, the ALJ cited

24

25  _____

26  [2]    The record reflects that Sweezy gained a substantial amount of weight after his injury (AR 441 (reflecting weight of 192 pounds on July 31, 2008), AR 308 (reflecting

27  weight of 258 pounds on January 5, 2009)), but he reported losing 34 pounds as of May 2011 (AR 559, 627 (reflecting weight of 229 pounds on May 4, 2011)).

28

Sweezy's function report, his testimony at the hearing,[3] and the report of Dr. Wetmore. There is not substantial evidence in the record to support the entirety of this finding by the ALJ. Sweezy reported that for lunch he would prepare sandwiches or ramen noodles, although he would not the use the stove because he had left it on and caused a fire, and Dr. Wetmore reported that Sweezy rarely cooked. (AR 139, 402.) Nothing in the record supports a finding that Sweezy cleaned, did laundry, washed dishes, or shopped. (AR 140, 402.) Sweezy reported that with a lot of rest breaks, over the course of a day, he would rake the yard once a month. (AR 140.) Sweezy indicated he could take care of his personal needs, although he reported laying down to get dressed, being supervised by his wife to shower, and that his wife would set out his medication for him. (AR 139, 402.) Sweezy does not drive because his medication makes him drowsy and dizzy.[4] (AR 140.) The record does reflect that Sweezy spent time watching television, playing video games, listening to music, and trying to draw. (AR 54-55, 141, 402.)

Critically, "the mere fact that a plaintiff has carried on certain daily activities . . . does not in any way detract from her credibility as to her overall disability." *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001). However, if a claimant's activities contradict his testimony, or the claimant spends a substantial portion of his day at activities that involve skills transferable to a work setting, those circumstances can form the basis for an adverse credibility determination. *See Orn*, 495 F.3d at 639. The ALJ did not find, and the record does not reveal, that Sweezy's activity level was contrary to his testimony. Sweezy's limited daily activities that are supported by the record – preparing simple foods once a day, personal care with some assistance, slowly-paced yard work once a month, and in-home entertainment such as television and drawing – do not equate to spending a substantial portion of his day at skills transferable to the work place.

---

[3]   The hearing transcript indicates the tape stopped for six minutes. (AR 51.) The transcript as submitted contains almost no information about Sweezy's activities of daily living. (AR 48-56.)

[4]   The ALJ characterized it as Sweezy could drive "but prefers not to." (AR 37.) Sweezy stated that because he feels dizzy and drowsy, he doesn't want to risk hurting someone. (AR 140.)

Fourth, the ALJ relied upon Sweezy's testimony about his abilities to conclude he was not fully credible. The ALJ stated that Sweezy admitted he could lift twenty pounds and stand for six hours of a work day, which is consistent with an ability to do light exertional work. The full range of light work involves lifting no more than 20 pounds at a time, with frequent lifting of 10 pounds, and the ability to walk/stand for 6 hours of a work day. 20 C.F.R. § 404.1567(b); SSR 83-10. In the transcript before the Court, *see supra* n.3, Sweezy testified that he could stand for 45 minutes to an hour before needing to sit or lay down. (AR 53.) The transcript does not reflect an admission that he could stand for 6 out of 8 hours of a work day. Sweezy testified that the heaviest weight he could carry across the room was approximately 19 pounds (*id.*), but he did not testify about how frequently he could carry any amount of weight. There is not substantial evidence to support this finding by the ALJ.

Next, the ALJ stated that Sweezy admitted to applying for other jobs that he believed he could perform with his current RFC. The testimony upon which the ALJ relied is not reflected in the transcript before the Court. *See supra* n.3. Sweezy testified he had looked for other work but did not feel he could work full-time at a sitting or standing job for 40 hours per week. (AR 56.) Therefore, there is not substantial evidence to support the ALJ's findings based on Sweezy's "admissions."

Defendant did not defend the ALJ's credibility finding on any of these four grounds, in fact, she did not mention them in her brief. Rather, Defendant argues that the ALJ's credibility finding can be upheld on two other grounds. First, Defendant argues the ALJ discounted Sweezy's credibility because he improved with treatment. Although not tied to his credibility finding in any direct way, the ALJ did find that Sweezy's condition improved with treatment. (AR 36.) The Court, therefore, evaluates this finding. Specifically, the ALJ stated that Sweezy reported improvement with epidural steroid injections. (*Id.*) He found that, subsequently, Sweezy reported significant improvement after a spinal cord stimulation trial in September 2011. (*Id.*) The ALJ further found that the permanent stimulator was effective. (*Id.*)

1    In support of his finding that Sweezy experienced improvement from injections,

2    the ALJ cited 55 pages of the record (Exhibit 25F). (AR 36.) Review of those documents

3    reveals very limited and temporary improvement after ten injections. Sweezy generally

4    reported almost no improvement in his low back pain from the injections, although one

5    injection did improve some radicular symptoms. (AR 457, 458, 461, 465.) After a

6    different injection, Sweezy reported meaningful improvement but it lasted only a few

7    weeks. (AR 466.) The doctor that conducted the injections reported suboptimal results

8    and recommended a spinal cord stimulator. (AR 467.) During the 10-month period in

9    which he received injections, Sweezy saw other doctors and took pain medications, but

10   continued to report chronic low back pain. (AR 349, 352, 622, 624, 626, 629, 632, 635.)

11   As found by the ALJ, Sweezy reported significant improvement from the

12   September 2011 spinal cord stimulator trial, which lasted for five days. (AR 470, 610.)

13   The permanent stimulator was implanted in November of that year. (AR 426.) In support

14   of his finding that the permanent stimulator provided effective relief for Sweezy's back

15   pain, the ALJ cited 56 pages of record (Ex. 32F), only 18 pages of which reflect events

16   occurring after implantation of the permanent stimulator. (AR 588-643.) The ALJ also

17   cited a lack of treatment records after the implantation. (AR 36.) Neither of these provide

18   substantial evidence to support this finding.

19   In December, Sweezy reported to his psychiatric nurse practitioner that the

20   stimulator was not working as well as expected. (AR 520.) At a January 2012

21   appointment with his primary care doctor, Kimberly Carlson, Sweezy was using crutches

22   and stated that he was still in pain but it was a bit better after a recent stimulator

23   adjustment. (AR 603.) In April, he reported having "wrenched" his back and his pain was

24   an 8/10 without medication, down to a 6/10 with medication. (AR 589.) The last records

25   request to the Center for Neurosciences (the location of his doctor that implanted the

26   stimulator) was sent on November 22, 2011, just after the implantation. (AR 421.)

27   However, the records of Dr. Carlson indicate that Sweezy was continuing to have the

28   stimulator adjusted. (AR 603 (noting stimulator reprogrammed on January 12, 2012), AR

589 (noting stimulator adjusted week prior to April 30, 2012).) At the May 2012 hearing, Sweezy testified that the stimulator was not providing relief, and the doctors told him they would keep adjusting it and hopefully find a helpful frequency; if not, spinal fusion was an option. (AR 52-53.) The medical evidence in the record demonstrates that the permanent stimulator was not very effective, contrary to the ALJ's finding. Additionally, the record does not support the ALJ's finding that Sweezy's treatment after implantation was scarce. Records and Sweezy's testimony document that he was having the stimulator adjusted periodically. If the ALJ thought those documents were ambiguous or insufficient to evaluate the evidence, he had an obligation to develop the record to include the documentation of those stimulator-adjustment appointments. *See Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001).

It is debatable whether the ALJ discounted Sweezy's credibility on the basis of improvement with treatment. Accepting Defendant's argument to that effect, there is not substantial evidence of record to support the ALJ's finding that Sweezy experienced improvement with injections and the permanent implantation of a spinal cord stimulator. The only improvement was very short term, from one injection and the *trial* spinal cord stimulator, which was only tested for five days.

Second, Defendant cites the ALJ's finding that Sweezy's allegations exceed what would be expected based upon the medical record. By way of example, the ALJ stated that Sweezy's treating physicians characterize the clinical findings as "'minimal', 'mild', 'slight', 'normal', and 'unremarkable.'" The ALJ provided no record citation to support this example. (AR 38.) Regardless, if the objective medical evidence fully explained a claimant's symptoms then credibility would be irrelevant. Credibility factors into the ALJ's decision only when the claimant's stated symptoms are not substantiated by the objective medical evidence. SSR 96-7p. Thus, it is error for an ALJ to discount credibility solely because a claimant's symptoms are not substantiated by the medical evidence. *Id.*; *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997). As this is the only basis remaining for the ALJ's credibility finding, it is insufficient to sustain it.

- 13 -

**Step Five**

Because the Court is remanding this case in light of the ALJ's erroneous credibility finding, it does not reach Plaintiff's argument regarding the use of the Grids at Step Five.

## CONCLUSION

A federal court may affirm, modify, reverse, or remand a social security case. 42 U.S.C. § 405(g). When a court finds that an administrative decision is flawed, the remedy should generally be remand for "additional investigation or explanation." *INS v. Ventura*, 537 U.S. 12, 16 (2006) (quoting *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)); *see also Moisa v. Barnhart*, 367 F.3d 882, 886 (9th Cir. 2004). However, a district court should credit as true medical opinions and claimant symptom testimony that was improperly rejected by the ALJ and remand for benefits if:

> (1) the ALJ failed to provide legally sufficient reasons for rejecting the testimony; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Benecke v. Barnhart*, 379 F.3d 587, 594 (9th Cir. 2004); *Garrison v. Colvin*, 759 F.3d at 1021 (finding credit as true mandatory unless there are serious doubts that the claimant is disabled).

Here, the Court found the ALJ improperly rejected Sweezy's symptom testimony. However, Sweezy did not establish that if his testimony were credited, the ALJ would necessarily find him disabled. First, Sweezy testified that he could stand for 45 minutes to an hour without needing to sit, could walk for 20 minutes before needing to lie down, and could sit for an hour before needing to stand or lay down.[5] (AR 53.) Sweezy did not testify as to how many hours a day he could alternate sitting and standing. Additionally, it is the role of the ALJ to translate those limitations into an RFC. Second, in his 2010

---

[5] Sweezy also testified to his belief that he could not work full time. (AR 56.) That is the ultimate question of disability, which is left to the ALJ. 20 C.F.R. § 1527(d)(1).

function report, Sweezy stated that he could finish what he started, concentrating for maybe 2 hours (AR 142); but, by the 2012 hearing, he testified that it takes him a long time to finish something and that he generally loses focus and does not complete even watching a movie (AR 54). It is for the ALJ to resolve this ambiguity. Additionally, one-third of the hearing before ALJ Buls was not recorded; therefore, a second hearing will document the entirety of Sweezy's testimony.

After considering all of Sweezy's testimony about his physical abilities, the ALJ then needs to re-evaluate Sweezy's RFC. As mentioned above, the ALJ must also consider Dr. Hassman's opinion that Sweezy would need to change position for 5-10 minutes every hour. Finally, the ALJ may need to call a vocational expert to testify.

Accordingly,

**IT IS ORDERED** that this case is remanded to the ALJ for a new hearing and further proceedings, pursuant to sentence four of 42 U.S.C. § 405(g). The Clerk of Court should enter judgment and close this case.

Dated this 7th day of August, 2015.

D. Thomas Ferraro
United States Magistrate Judge